**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **MARVIN SHERMAN FRANK** | § | |
| **TDCJ NO. 876556** | § | |
| | § | |
| **v.** | § | **C.A. NO. C-06-003** |
| | § | |
| **WARDEN KENNEDY, ET AL.** | § | |

**MEMORANDUM AND RECOMMENDATION
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In this civil rights action, plaintiff Martin Sherman Frank claims that defendants failed to protect him from inmate violence while he was confined at the McConnell Unit, despite the fact that defendants knew of the violence to which he was exposed. Defendants move for summary judgment to dismiss plaintiff's claim for failure to exhaust administrative remedies, as time barred, and on the grounds of qualified immunity.   (D.E. 60, 65).  Plaintiff has filed objections to defendants' affidavits (D.E. 67), and a response in opposition to the summary judgment motion.  (D.E. 68, 78). Defendants have filed a reply.  (D.E. 80).

For the reasons stated herein, it is respectfully recommended that the Court grant defendants' motion for summary judgment and dismiss plaintiff's claims with prejudice for failure to exhaust administrative remedies.

## I.  JURISDICTION

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## II.  BACKGROUND

 Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), and at all times relevant to the facts of this lawsuit, was incarcerated at the McConnell Unit in Beeville, Texas.  He filed his original complaint on January 9, 2006, claiming

that defendants failed to protect him from an inmate assault on March 14, 2004.  In particular, he claimed that, prior to the assault, he had informed Warden Eileen Kennedy, Warden Alfonso Castillo, Captain Monty Walker, Sergeant Steven Garcia, and Hilda Silvas, of threats against him, and had requested safekeeping, protective custody, and a transfer off the McConnell Unit, but that defendants "consciously disregarded" the substantial risk of serious harm to him.  (D.E. 1, 11).  He sought compensatory and punitive damages, as well as injunctive relief in the form of a transfer off the McConnell Unit.[1]

Following plaintiff's filing of a more definite statement (D.E. 10), service was ordered on defendants.  (D.E. 14).  Defendants filed their answers, and each has raised the defense of qualified immunity.  (D.E.  27, 35).

Defendants moved for dismissal of plaintiff's claims against them in their official capacities as barred by the Eleventh Amendment.  (D.E. 28, 37).  Those motions were granted and plaintiff's claims against defendants in their official capacities were dismissed on October 22, 2006.  (D.E. 59).

On October 23, 2006, defendants filed the instant motion for summary judgment (D.E.60), and on November 27, 2006, they filed a supplement.  (D.E. 65).  On December 11, 2006, plaintiff filed objections to defendants' affidavits (D.E. 67), and his response in opposition to the summary judgment motion.  (D. E. 68).  He has since filed a supplemental objection.  (D.E. 78).  Defendants have filed a reply to plaintiff's objections.  (D.E. 80).

---

[1] Plaintiff was transferred off the McConnell Unit on April 9, 2004.  (DX-A at 51).

2

### III.  SUMMARY JUDGMENT EVIDENCE
### AND UNCONTESTED FACTS

In support of their amended motion for summary judgment, defendants offer the following summary judgment evidence:

Ex. A:  Plaintiff's classification records;

Ex. B:  Unit Classification Committee minutes/docket sheets related to plaintiff;

Ex. C:  McConnell Unit Offender Protection Log;

Ex. D:  Plaintiff's Grievance Records, dated between September 2003 through January 2006;

Ex. E:  TDCJ Classification Plan (March 2002);

Ex. F:  TDCJ Administrative Directive (July 12, 2002);

Ex. H: Affidavit of Eileen Kennedy;

Ex. I:   Affidavit of Alfonso Castillo;

Ex. J:   Affidavit of Hilda Silvas;

Ex. K: Affidavit of Monty Walker; and

Ex. L:  Affidavit of Sergeant Steven Garcia.

(See D.E. 60, 65, attached exhibits).[2]

The following facts are not in dispute:

Plaintiff was assigned to the McConnell Unit from October 4, 1999 to April 9, 2004.  (DX-A at 52, 51).   On December 21, 2003, plaintiff verbally reported to a correctional officer that he believed his life was in danger.  (DX-A at 194).  A life in danger ("LID") investigation was initiated,

---

[2] Reference to defendants' exhibits will be to "DX" followed by the exhibit letter and a page reference. Defendants' exhibits do not include an exhibit "G."  The affidavit of Ms. Silvas (DX-J), and Sergeant Garcia (DX- L), were originally filed unsigned; however, in their motion to supplement (D.E. 65), which was granted (D.E. 73), defendants substituted signed originals for the unsigned affidavits.

and Lieutenant Jennifer Quintana was assigned to investigate plaintiff's LID claim.  (Id. at 194-98).  Plaintiff told Lieutenant Quintana that members of the Crips gang  were harassing him because he had caused his last cell mate, who was a member of the Crips, to be moved out.  (Id.  at 194).  Plaintiff could not identify any of the inmates who had made threats against him.  (Id. at 196). He requested to be transferred to another unit.  Id.

Plaintiff was placed in transit status during the investigation.[3]  (DX-A at 194, 54).

On December 23, 2003, plaintiff went before the Unit Classification Committee ("UCC") for a life endangerment review.  (DX-B at 763-64).  The members on the UCC panel were Assistant Warden Castillo, Ms. Silvas, and Captain Walker.  (Id.).  The UCC denied plaintiff's LID claim based on insufficient evidence.  (DX-A at 196).

On December 24, 2003, plaintiff filed a Step 1 grievance complaining about Lieutenant Quintana's LID investigation, and also complaining that the UCC's December 23, 2003 decision to deny his LID complaint was biased.  (DX-D at 536-37).  In particular, plaintiff claimed that, because Warden Castillo, Captain Walker, and Hilda Silvas are not of African American descent, they did not understand how his life could be in danger because he is 6'3" and weighs 215 pounds.  Id.  His grievance was denied on January 9, 2004.  Id. at 537.  He did not file a Step 2 grievance on this issue.  After the UCC hearing, plaintiff received a housing change and was assigned to 7 building,

---

[3] Transit housing is a secured building or wing of the prison, away from the regular activity of the prison.  (DX-E at 16).  Offenders assigned to transit status are housed in single cells and are escorted by correctional officers when out of their cells.  Id.  Offenders can be housed in transient status: (1) as a temporary housing to provide time to the prison unit to assign the inmate to a more permanent custody level and housing; and/or (2) as a temporary means to ensure their safety from the rest of the offender population. Id.

G Pod, 1 Section, 3 Row.  (DX-A at 54).   On that same day, December 23, 2003, plaintiff was moved to overflow housing at 3 Building, A Pod, 3 Section,  3 Row as overflow housing.  (Id. at 54).

On December 29, 2003, plaintiff sent the Classification Department an I-60 request to officials stating that he would have problems in general population.  (DX-A at 187).   Plaintiff was moved to transient housing, pending the investigation.  (Id. at 54).

On December 29, 2003, an LID investigation was opened and Officer M. Acheson was assigned to investigate plaintiff's claims.  (DX-A at 185–90).  Plaintiff related to Officer Acheson that he had received threats from two offenders who were members of the Crips.  (Id. at 187).  In addition, plaintiff claimed that he would not be safe as long as he was housed with 18 and 19 year old offenders, since he was 41, and he believed that Lieutenant Quintana had placed him in further danger during the last investigation.  (Id.)  Officer Acheson determined that plaintiff's LID claim should be forwarded to the Security Threat Group Office ("STGO") for further information.  (Id.)

On January 2, 2004, plaintiff appeared before a UCC on his LID claim, seeking a unit transfer.  (DX-B at 765-66).   The members of the UCC were Assistant Warden Kennedy, Investigator Puente, and Captain Smith.  (Id.)  The UCC denied plaintiff's LID claim due to insufficient evidence to support his allegations. (DX-A at 187).

Plaintiff did not file a Step 1 or Step 2 grievance concerning the UCC's January 2, 2004 decision.  (DX-D).

On January 7, 2004, plaintiff notified security staff that his life was in danger because he had received an anonymous letter from the Crips while he was in transient status.  (DX-A at 171-72, 177).  On that same day an LID investigation was initiated by Lieutenant J.H. Hager.  (Id. at 170-78).  Plaintiff identified four offenders allegedly involved in the incident: two as making the threats

against him, Hagers and Miller, and two as witnessing the threats, Martin and Villegas.  (Id. at 170).

Offenders Martin and Villegas refused to be interviewed.  (Id. at 172).  On January 13, 2004, the

STGO reported that none of the four offenders identified was being watched by STGO in regards

to any affiliation with any gang or group.  (Id. at 173).

A UCC meeting was held on January 14, 2004.  (DX-B at 767).  The UCC members were

Major Carillo, chairperson, Grievance Investigator M. Puente, and Chief of Classification, M.A.

Gonzales.  (Id.)  The UCC denied plaintiff's request for a unit transfer, finding insufficient

information to warrant a transfer.  (DX-A at 172).

Plaintiff did not file a Step 1 or Step 2 grievance concerning the UCC's January 14, 2004

decision.  (DX-D).  However, on January 21, 2004, he filed a Step 1 grievance complaining about

Lieutenant's investigation of his LID claim.  (DX-D at 528-29).  Plaintiff claimed that Lieutenant

Hagar was lazy and failed to interview two witnesses.  Id.  The Classification Department treated

the grievance as a LID complaint, and an investigation was initiated.  ( DX-B at 753).  On January

22, 2004, plaintiff told Lieutenant Quintana that he had received numerous threats from members

of the Crips, and that they were starting rumors that he was a snitch and a child molester.  (DX-A

at 167).  He reported that an offender named "Martin" had made a threat against him, but that

officials did not take his LID complaints seriously.  (Id. at 164).   However, he stated that he was

currently not in danger in his present housing area, nor was he having any problems with his current

cell mate or in general population.  (Id. at 166).  He signed a waiver of his LID claim.[4]  (Id.)  On

---

[4] The Offender Waiver Statement states in relevant part, "... THE SITUATION HAS BEEN
RESOLVED AND I NO LONGER REQUIRE PROTECTION/TRANSFER. I UNDERSTAND THAT THE
ALLEGATIONS I MADE WHICH RESULTED IN THIS INVESTIGATION WILL NOT BE
INVESTIGATED AGAIN UNLESS THERE IS NEW EVIDENCE THAT SHOULD WARRANT
ANOTHER INVESTIGATION."  (DX-A at 158).

January 26, 2004, the STGO reported that Offender Martin was not being monitored by STGO, nor was plaintiff.  (DX-A at 169).

On January 28, 2004, plaintiff went before a UCC consisting of Assistant Warden Castillo, chairperson, Captain Moreno and Case Manager Amy Gaitan.  (DX-B at 768).  The UCC denied plaintiff's claim based on his waiver.  (DX-A at 166).

Plaintiff did not file a Step 1 or Step 2 grievance concerning the UCC's January 28, 2004 decision.  (DX-D).

On February 23, 2004, the Classification Department received an I-60 request from plaintiff labeled "Urgent," and complaining that he was in a "compromising situation"that could lead to injury or death. (DX-A at 161).   He requested a transfer off the unit or to a new pod.  Id. An LID investigation was opened on that same day. (DX-A at 157-159).  Plaintiff told Lieutenant DeLaRosa that he had a conflict with his cell mate and that a housing change would resolve the problem.  (Id. at 158).  Plaintiff was moved that same day to a different cell.  (DX-A at 54).  Plaintiff signed a waiver of his LID claim.  (DX-A at 158).

A UCC hearing was held on February 27, 2004, before Assistant Warden Kennedy, chairperson, Captain Walker, and Case Manager Gaitan.  (DX-B at 753).  The UCC denied plaintiff's request for a unit or pod transfer based on his housing change and his waiver of his LID claim.  (DX-A at 158).

Plaintiff did not file a Step 1 or Step 2 grievance concerning the UCC's February 27, 2004 decision.  (DX-D).

On March 15, 2004, plaintiff reported to Sergeant Garcia that he had been assaulted by three inmates the night before in the bathroom.  (DX-A at 145).  An investigation was opened, and

plaintiff told Lieutenant Gallegos that offenders Nathan Dumas, Jimmy Davis, and Michael Knox had attacked him in the 3-Row shower, injuring his eye and index finger.  (Id. at 141).  STGO reported that offender Dumas was an unconfirmed member of the Bloods, while both Davies and Knox were confirmed members of the Crips.  (Id. at 144).

A UCC hearing was held on March 17, 2004.  (DX-B at 771-72).  The UCC members were Warden Kennedy, Unit Risk Manager Frank Blecher, and Case Manager Cowan.  Id.  The UCC recommended that plaintiff be transferred off the McConnell Unit.  (DX-A at 143).

Pending his transfer, plaintiff was housed in transient status.  (DX-A at 54).  Plaintiff was transferred off the McConnell unit on April 9, 2004.  (Id. at 51).

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  Id.  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

8

therein." Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." Anderson, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.

# V. <u>DISCUSSION</u>

**A.     Failure to Exhaust Administrative remedies.**

Defendants move for summary judgment to dismiss plaintiff's claims on the grounds that he has failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e.

The Prison Litigation Reform Act provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents. <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002); <u>Clifford v. Gibbs</u>, 298 F.3d 328, 330 (5th Cir. 2002). Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process. <u>Booth v. Churner</u>, 532 U.S. 731, 734 (2001); <u>Wright v. Hollingsworth</u>, 260 F.3d 357, 358 (5th Cir. 2001). The Supreme Court recently clarified that a prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court. <u>Woodford v. Ngo</u>, 126 S. Ct. 2378, 2382 (2006).

The Texas Department of Criminal Justice ("TDCJ") currently provides a two-step procedure for presenting administrative grievances. Step 1 requires the prisoner to submit an administrative grievance at the institutional level. <u>Wendell v. Asher</u>, 162 F.3d 887, 891 (5th Cir. 1998) (citing to TDCJ Administrative Directive No. AD-03.82 (rev. 1), Policy, ¶ IV (Jan. 31, 1997)). After an investigation, the unit grievance investigator prepares a report and makes a recommendation to the final decision maker, which may be the warden, assistant warden, facility administrator, assistant

facility administrator, or health administrator.  Id.  Step 2 permits the prisoner to submit an appeal

to the division grievance investigator with the Institutional Division of the TDCJ.  Id.  After an

investigation, the departmental grievance investigator prepares a report and makes a

recommendation to the final decision maker for Step 2 of the process, which is the director, deputy

director, regional director or assistant director.  Id.

The grievance procedure takes approximately ninety days to exhaust.  Wendell, 162 F.3d at

891.  Prisoners are allowed fifteen calender days to file a Step 1 grievance.  Id. (citing TDCJ Admin.

Directive No. AD-03.82 (rev. 1), Policy ¶ VI (Jan. 31, 1997)).  The response to the Step 1 grievance

is due within forty days after receipt of the grievance.  Id.  The prisoner then has ten days to submit

an appeal.  Id.  The response to the Step 2 grievance is due within forty days after receipt of the

prisoner's appeal.  Id.  The TDCJ Inmate Grievance System provides that, if an inmate does not

receive a written decision within 180 days after the grievance is filed, he may proceed with his other

state or federal court remedies.  Tex. Gov't Code § 501.008(d)(2).  A prisoner must pursue his

grievance at both the Step 1 and Step 2 levels in order to exhaust his administrative remedies.  See

Johnson v. Johnson, 385 F.3d 503, 515 (5th Cir. 2004), citing Wright, 260 F.3d at 358.

The purpose of the exhaustion requirement is to alert prison officials of problems so that the

prison has a chance to address the claims before they reach federal court.  Woodford, 126 S.Ct. at

2388.  As acknowledged by the Supreme Court, Congress intended the administrative process to

"filter out some frivolous claims and foster better-prepared litigation once a dispute did move to the

courtroom, even absent formal factfinding."  Booth, 532 U.S. at 737.

In his original complaint, plaintiff indicated that he had exhausted both steps of the grievance

procedure concerning his failure to protect claims against the named defendants.  (See D.E. 1 at ¶

11

III).  For purposes of § 1915A screening, his claims were allowed to proceed forward based on his

representation.  However, defendants have now offered copies of the grievances filed by plaintiff

from January 2003 through January 2006, covering the time period at issue in this case, and the

uncontroverted evidence reveals that plaintiff has failed to exhaust his failure to protect claims as

to the defendants named herein.

      Exhibit D reveals that the following grievances were filed by plaintiff:

(1)      Grievance #2004027955, Step 1 dated October 12, 2003,  complaining about his personal property being confiscated and certain items lost; Step 2 filed November 31, 2003 (DX-D at 447-48, 445-46);

(2)      Grievance # 2004032287, Step 1 dated October 28, 2003, complaining about a disciplinary conviction for refusing an order to move; no corresponding Step 2 grievance filed (DX-D at 543-44);

(3)      Grievance # 2004075538, Step 1 dated December 24, 2003, complaining about Lieutenant Quintana's LID investigation and alleging that the UCC's decision to deny his LID complaint was biased because Warden Castillo, Captain Walker, and Hilda Silvas are not of African American descent; no corresponding Step 2 grievance filed (DX-D at 536-37);

(4)      Grievance #2004090912, Step 1, dated January 21, 2004, complaining about Lieutenant Hager's LID investigation; no corresponding Step 2 grievance filed (DX-D at 528-29);

(5)      Grievance #2004135556, Step 1 dated March 30, 2004, requesting safe keeping status at new unit after transfer; Step 2 grievance filed May 4, 2004, appealing denial of safe keeping status at new unit   (DX-D at 433-34, 431-32);

(6)      Grievance #2004147724, Step 1 dated April 21, 2004, complaining about Officer Cantu and loss of property following transfer to Clements Unit; no corresponding Step 2 grievance filed (DX-D at 522-23);

(7)      Grievance #2004172210, Step 1 dated May 26, 2004, complaining about lost property; no corresponding Step 2 grievance filed (DX-D at 516-17);

(8)      Grievance #2004190217, Step 1 dated June 22, 2004, complaining about lost property; no corresponding Step 2 grievance filed (DX-D at 512-13); and

(9)     Grievance #2005135556, Step 1 dated September 21, 2004, and Step 2 dated November 8, 2004, seeking specialized medical services (DX-D at 412-415).

See DX-D.

Thus, in summary, during the four-month time period between December, 2003 and March 2004, plaintiff filed the following LID complaints and had the following hearings:

| LID date | UCC date/decision | Grievance |
|----------|-------------------|-----------|
| 12/21/03 | 12/23/03 – housing changed; transfer denied | Step 1 |
| 12/29/03 | 1/02/04 – transfer denied | None |
| 1/07/04 | 1/14/04 – transfer denied | Step 1 |
| 1/22/04 | 1/28/04 – signed waiver; transfer denied | None |
| 2/23/04 | 2/27/04 – signed waiver; housing changed; transfer denied | None |
| 3/15/04 | 3/17/04 – transfer recommended | None |

Plaintiff did not file any grievances challenging the UCC's denial of his LID claims as to the December 29, 2003, January 22, 2004, February 23, 2004, or March 15, 2004 hearings. Although he did file a grievance after the December 29, 2003 UCC decision, that grievance complains primarily about Lieutenant Quintana and her investigation of his claim. (See DX-D at 536-37). He claims that she was unprofessional by talking to him about his LID claim in front of other inmates, and that she was 'tired" and rushed through the investigation. As to the defendants named herein, however, he alleged only that Warden Castillo, Captain Walker and Hilda Silvas might be "biased" against him because they do not understand adequately his situation.

13

In <u>Johnson v. Johnson</u>, 385 F.3d 503 (5th Cir. 2004), the Fifth Circuit discussed how much detail is required in a grievance for purposes of effectively exhausting administrative remedies. The Court noted that one of the purposes of the exhaustion requirement is to give officials "'time and opportunity to address complaints internally.'" <u>Johnson</u>, 385 F.3d at 517 (citations omitted). In addition, the nature of the complaint will influence how much detail is necessary. <u>Id.</u> For example, a complaint about a correctional officer would identify a specific person, whereas a complaint about a prison condition might not identify any individual. <u>Id.</u>

Plaintiff's Step 1 grievance complaining about the December 23, 2003 UCC decision does name Warden Kennedy or Sergeant Garcia. As to the other defendants, his allegation of "bias" does not state a claim for failure to protect: he does not alleged that any named defendant was aware of a serious risk to his health and safety and ignored that risk. See <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994) (a prison official is deliberately indifferent to the inmate's safety if the official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it). Moreover, even if the Court were to find plaintiff's Step 1 grievance sufficient to alert prison officials as to his failure to protect claims against the defendants named herein, he failed to file a Step 2 grievance. As such, he has failed to exhaust his administrative remedies.

Similarly, as to the January 14, 2004 UCC decision, plaintiff filed a Step 1 grievance thereafter complaining about Lieutenant Hagar's investigation and his alleged failure to interview witnesses. (DX-D at 528-29). However, plaintiff did not name any defendant in this lawsuit in that grievance. Further, he did not file a Step 2 grievance pursuing the matter to completion. He has not exhausted his administrative remedies.

14

The Fifth Circuit has recognized that the exhaustion requirement may, in rare circumstances, be excused where dismissal would be inefficient or would not further the purposes of the PLRA. Wilson, 151 F.3d at 295.  For example, exhaustion may be excused where irregularities in the prison administrative system itself prohibited the plaintiff from doing so.  Id.; see also Shah v. Quinlin, 901 F.2d 1241, 1244 (5th Cir.1990). An administrative remedy is not available where prison officials ignore or interfere with the prisoner's pursuit of relief. Id.  And see Holloway v. Gunnell, 685 F.2d 150, 154 (5th Cir. 1982).

In his summary judgment response, plaintiff has not addressed the exhaustion argument. (See D.E. 68, 78).  As such, he has failed to offer any explanation as to why he did not pursue his administrative remedies to their conclusion.  Moreover, the fact that he has successfully exhausted his administrative remedies on unrelated claims on prior occasions is some evidence that he understands the TDCJ grievance process and has availed himself of it in the past.  (See DX-D). There is no allegation that plaintiff was in any manner prevented from pursuing his administrative remedies.

Plaintiff has failed to exhaust his administrative remedies and there are no grounds to excuse exhaustion.  Accordingly, it is respectfully recommended that defendants' motion for summary judgment to dismiss plaintiff's claims for failure to exhaust be granted.[5]

## B.    Statute of Limitations.

Defendants move to dismiss plaintiff's claims concerning events that occurred prior to December 30, 2003, as barred by the limitations.

---

[5] Generally, a dismissal for failure to exhaust is without prejudice.  In this case, however, dismissal is effectively with prejudice as plaintiff's claims, were he to re-file them following exhaustion, would be barred by limitations.

Federal civil rights actions instituted in Texas, such as those brought pursuant to 42 U.S.C. § 1983, are deemed analogous to personal injury claims, and, therefore, the applicable limitations period is two years.  Tex. Civ. Prac. & Rem. Code § 16.003(a).  Accrual of a § 1983 claim is governed by federal law.  A cause of action accrues when the plaintiff knows or has reason to know of the injury, which is the basis for the action.  Gonzales v. Wyatt, 157 F.3d 1016, 1020 (5th Cir. 1998).  Time during which administrative remedies are pursued tolls the limitation period.  Harris, 198 F.3d at 158.

Plaintiff complains of defendants' actions prior to the March 14, 2004 assault.  However, it is the assault itself which triggers plaintiff's failure to protect claims.    Plaintiff executed his complaint on December 30, 2005, and it is deemed filed as of that date.  See Spotville v. Cain, 149 F.3d 374, 376 (5th Cir. 1998) (per curiam).  His lawsuit complaining of the March 14, 2004 assault is timely.  Thus, it is recommended that, to the extent defendants seek dismissal of claims as barred by limitations, defendants' motion for summary judgment be denied.

**C.    Failure to protect claims and qualified immunity.**

In the alternative, defendants' move for summary judgment to dismiss plaintiff's failure to protect claims on the grounds that they are entitled to qualified immunity.

The qualified immunity determination involves a two-step analysis: first, "'whether the facts alleged, taken in the light most favorable to the party asserting the injury, shows that the officer's conduct violated a constitutional right.'"  Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir. 2003) (quoting Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001)).  If a constitutional violation is alleged, the Court must next determine "whether the right was clearly established – that is 'whether

it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. at 624 (quoting Price, 256 F.3d at 369).

Once a defendant has invoked the defense of qualified immunity, the burden shifts to plaintiff to show that the defense is inapplicable. McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam). The threshold question in a qualified immunity analysis is whether a constitutional right would have been violated on the facts alleged. Saucier v. Katz, 533 U.S. 194, 200 (2001).

### 1.   Step 1: Constitutional violation.

Prison officials have a duty to protect prisoners from violence at the hand of prison staff, as well as other inmates. See Cantu v. Jones, 293 F.3d 839, 844 (5th Cir. 2002) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). A prison official is deliberately indifferent to the inmate's safety if the official knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. Id. (citing Farmer, 511 at 847). Deliberate indifference describes a state of mind "more blameworthy than negligence;" there must be "more than ordinary lack of due care for the prisoner's interests or safety." Farmer, 511 U.S. at 835. Deliberate indifference may be inferred from the fact that the risk of harm is obvious. Hope, 536 U.S. at 738-39.

Here, there is simply no evidence to suggest that defendants were aware of a serious risk of harm to plaintiff's health and safety prior to the March 14, 2004 assault, and that defendants failed to take steps to reduce that risk. The uncontested evidence establishes that, during the three-month time period preceding the March 14, 2004 assault, plaintiff filed five LID complaints, and five separate investigations were opened to evaluate his claims. (DX-A at 159-198). For each

investigation, an officer was appointed to interview plaintiff, take statements from witnesses, and follow up with STGO if necessary.  (Id.)  Each time plaintiff filed a complaint, he was placed in transit housing pending the investigation.  (DX-A at 54).

Concerning his December 21, 2003 complaint, a change of housing resolved the issue.  (DX-A at 54).  His LID claim was then denied.  (DX-A at 196).  His December 29, 2003 and January 7, 2004 claims were both denied because of insufficient evidence.  (DX-A at 187, 172).  In both of those cases, plaintiff could not identify the inmates that had threatened him, nor could he provide investigators with any specifics as to his claims.   (Id.)

In their affidavits, defendant Kennedy and Castillo note the TDCJ criteria considered in evaluating LID claims:

> In 2004, TDCJ-CID policy allowed an inmate to be placed in safekeeping or protective custody at his request if the inmate provides evidence of a specific, identifiable threat.  Furthermore, a mere claim of being afraid for one's safety is usually not enough to warrant placing an inmate in safekeeping or protective custody.   A unit administration cannot effectively protect an inmate unless they can identify the source of the alleged threat.

(DX-H, Kennedy Aff't at p. 3; DX-I Castillo Aff't at 3).

Similarly, Ms. Silvas testified that she denied plaintiff's December 23, 2003 transfer request because: "1) offender Frank claims that he has been harassed but not physically threatened, 2) that he could not identify in any way his alleged harassers, 3) that he could not provide any type of detailed threat to his safety from Crip members, 4) that he could not identify any specific offender as being the source of his concerns, and 5) offender Franks complaints were too generalized to identify a threat to his safety."  (DX-J, Silvas Aff't at 3).  Defendant Silvas also testified that, in general, safekeeping status and housing are reserved for offenders who are "smaller and weaker in

statute, impaired mental capacity, homosexuals prone to victimization, or have other issues which would make them more prone to victimization by other offenders." (Id.)   She noted that, based on plaintiff's classification file, he is "6'0", 210 lbs, seemingly fit, of average mental functioning, and heterosexual," such that, without a specific threat, he did not need to be placed in safekeeping. (Id.) In fact, Ms. Silvas indicated that she would be concerned for putting other offenders at risk by placing plaintiff in protective housing. (Id.)

For the two LID claims immediately preceding the assault, one filed on January 22, 2004, and one filed on February 23, 2004, plaintiff  signed a waiver acknowledging that the issues had been resolved and that he did not want the matters investigated further.  That is, immediately preceding the assault, plaintiff's last official communication with defendants was that he was satisfied with his current housing assignment and was not in fear for his safety.  (DX-A at 159). There was no unresolved LID complaint pending at the time he was assaulted.  That is, even plaintiff did not suspect that he was in danger at the time the assault occurred.  Thus, plaintiff fails to demonstrate that he was at a serious risk of harm, let alone, that defendants knew of and disregarded that risk in deliberate indifference to his health and safety.  Plaintiff fails to fails to state a constitutional claim against defendants, and they are entitled to qualified immunity.

### 2.     Step 2: Objective reasonableness.

In the context of an Eighth Amendment failure to protect claim, whether a defendant's actions are objectively reasonable depends on whether the defendant both knew of the risk and failed to take reasonable measures to alleviate it.  Farmer, 511 U.S. at 847.  The Fifth Circuit has explained that "the 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference."  Domino v. Texas Dep't of Crim. Justice, 239 F.3d

752, 756 (5th Cir. 2001) (quoting <u>Farmer</u>, 511 U.S. at 838).  Moreover, "negligence is insufficient to support a finding of liability."  <u>Adames v. Perez</u>, 331 F.3d 508, 514 (5th Cir. 2003).  That is, prison officials violate the Eighth Amendment only if they are both aware of a substantial risk to inmate safety *and* fail to respond properly.  <u>Johnson</u>, 385 F.3d at 524.  There is no liability if the official responded reasonably to the risk, even if the harm ultimately was not averted.  <u>Id.</u>  When assessing objective reasonableness, it is necessary to articulate the asserted constitutional right more specifically.  <u>Thompson v. Upshur County</u>, 245 F.3d 447, 460 (5th Cir. 2001).  Thus, "[w]hen the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have known that the alleged acts of the defendants violated the United States Constitution."  <u>Id.</u>

As discussed above, the uncontested record establishes that plaintiff's numerous LID claims were investigated timely and thoroughly. The decision to deny him a unit transfer or safekeeping status were based on the evidence available.  No where did plaintiff ever allege that he had a history or specific problem with the three inmates who eventually assaulted him.  The names of his assailants had never come up in an LID investigation, nor had plaintiff identified any of those individuals to defendants.  Defendants' overall actions in responding to plaintiff's LID claims were objectively reasonable.  Defendants are entitled to qualified immunity.

## VI.  <u>RECOMMENDATION</u>

Plaintiff has failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e prior to filing suit and there are no circumstances to excuse exhaustion.  Thus, it is respectfully recommended that defendants' motion for summary judgment to dismiss plaintiff's claims for failure to exhaust be granted.  Alternately, defendants have demonstrated that there is no genuine issue of

20

a material fact as to their claim for qualified immunity, and it is recommended that summary judgment be granted in defendants' favor, and that plaintiff's failure to protect claims against defendants be dismissed with prejudice.

Respectfully submitted this 15th day of February, 2007.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to FED. R. CIV. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 2001-6, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Services Auto Ass'n, 79 F.3d 1415 (1996) (en banc).